# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MELVIN D. REED,

        Plaintiff,

    v.                                    Case No. 08-C-684

EWALD AUTOMOTIVE GROUP,

        Defendant.

---

MELVIN D. REED,

        Plaintiff,

    v.                                    Case No. 08-C-685

EWALD AUTOMOTIVE GROUP,

        Defendant.

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

On August 8, 2008, the plaintiff, Melvin D. Reed ("Reed"), who is proceeding pro se, commenced these actions by filing complaints naming Ewald Automotive Group ("Ewald") as the defendant.[1]  In his complaints, Reed generally asserts that Ewald discriminated against him and subjected him to a hostile work environment due to his race, in contravention of the Civil Rights Act of 1991 and Title VII.  Reed further claims that Ewald retaliated against him for filing a charge of discrimination also in contravention of the Civil Rights Act of 1991 and Title VII.  On November 2, 2009, the defendant filed a motion for summary judgment seeking the dismissal of Reed's claims.  The

---

[1] Reed filed the instant complaint naming Ewald as the defendant in Case No. 08-C-684.  Reed filed an additional complaint naming Ewald as the defendant in Case No. 08-C-685. On January 8, 2009, the court ordered pursuant to Civil L.R. 42.1(b) that Case No. 08-C-684 be consolidated with Case No. 08-C-685.  The court further ordered that all filings be filed in Case No. 08-C-684.

defendant's motion is now fully briefed and is ready for resolution. For the reasons that follow, the defendant's motion for summary judgment will be granted.

## I. FACTS

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.),[2] the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Pursuant to Civil Local Rule 56.1, the defendant's summary judgment filings also included a notice to Reed indicating that any assertion of fact set forth in the defendant's proposed findings of fact would be accepted as true unless Reed submitted his own affidavit or other documentary evidence contradicting such factual assertions. However, Reed's written submission in opposition to the defendant's motion did not include responses to the defendant's proposed findings of fact, as required under Civ. L.R. 56.2(b). Thus, in accordance with Civil L.R. 56.2(e), "the Court must conclude that there is no genuine material issued as to any proposed finding of fact" set out by the defendant.

The plaintiff filed a brief in response to the defendant's motion as well as a supporting affidavit and attachments to the brief. The plaintiff's response does not comply with Civil L.R. 56.2(b) because the response along with the supporting affidavit and attachments to the brief do not set forth "specific citations to evidentiary materials in the record which support the claim that a dispute exists." That having been said, because the plaintiff is proceeding pro se, the court will consider those portions of Reed's affidavit that are based on Reed's personal knowledge. Such being the case, the undisputed material facts are as follows.

Ewald Automotive Group is an automotive dealer group founded more than 40 years ago. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1). Ewald's Mayfair Chrysler Jeep, Inc., located

---

[2] The Civil Local Rules were amended in January 2010. However, because Ewald's motion was filed in November 2009, the pre-amendment Civil Local Rules apply to Reed's motion.

at 2201 N. Mayfair Road in Milwaukee, employed Reed as a sales associate from November 2, 2005 until March 6, 2006.  (DPFOF ¶ 3; Reed Affidavit ¶ 1.)

Throughout Reed's time at Ewald, the company maintained a misconduct policy that prohibited violence in the workplace.  (DPFOF ¶ 6.)  The Employee Handbook outlined Ewald's then in-force misconduct policy, in relevant part, as follows:

> It is the policy of EAG to expect all employees to abide by certain work rules of general conduct and performance at all times.  The regulations governing employee conduct and responsibilities have been established in the best interest of the company, its employees and its customers.
>
> Accordingly, a violation of these regulations constitutes misconduct on the part of the employee and appropriate disciplinary action will be initiated . . . .
>
> Disciplinary action may include, but is not limited to, verbal reprimand, written notice, suspension from work without pay, and immediate termination of employment . . . .
>
> Examples of misconduct include:
>
> > [F]ighting on job sites or company property;
> > Gross insubordination — a willful and deliberate refusal to follow reasonable orders by a member of management;
> > Use of threatening, profane or abusive language; and
> > Demonstration of lack of courtesy towards other employees, customers or vendors.

(DPFOF ¶ 7.)  Reed has acknowledged that he was aware during his employment with Ewald that violence in the workplace would not be tolerated.  (DPFOF ¶ 8.)

General Sales Manager John Scudder ("Mr. Scudder") was one of the individuals who interviewed Reed and it was Mr. Scudder's decision to hire Reed.  (DPFOF ¶ 9.)

As part of its sales practice, Ewald has a policy of providing the customer of a newly-purchased automobile with a full tank of gas.  (DPFOF ¶ 11.)  During his first sale, Mr. Reed refused Mr. Scudder's instruction to advance the money in order to fill the newly-purchased car.  (DPFOF ¶ 12; Reed Aff. ¶ 2.)  Reed has acknowledged that he does not contend that he was asked to advance

3

the money for the fuel as a result of race discrimination. (DPFOF ¶ 13.) Reed has not presented evidence to dispute that other salespeople were regularly asked to front gas money. (DPFOF ¶ 14.) Reed was not disciplined as a result of his refusal to comply with Scudder's request. (DPFOF ¶ 15.)

During Reed's time at Ewald, it was customary practice for a manager to step in and talk with a potential customer during sales negotiations, especially when the talks between the customer and the sales person had stalled. (DPFOF ¶ 16.) This custom was referred to as a "t.o." (DPFOF ¶ 17.)

On November 11, 2005, instead of allowing another manager an opportunity to talk with his client, Reed refused to allow the manager to make his presentation. (DPFOF ¶ 18.) The manager found Reed to be belligerent and incapable of taking constructive criticism. (DPFOF ¶ 19.) The manager then made a note regarding Reed's conduct and concerns regarding Reed. (DPFOF ¶ 19.) Reed was not reprimanded for the incident. (DPFOF ¶ 20.)

It was also Ewald's policy, on the mornings following any snowfall that produces a significant accumulation of snow, for all sales personnel to arrive typically at either 7:30 a.m. or 8:00 a.m. in order to clear the snow away from the cars on Ewald's sales lots. (DPFOF ¶ 21.) On one occasion, in early December 2005, Reed did not show up to assist with the snow removal. (DPFOF ¶ 22.) At the time, Reed stated that he did not understand the snow removal policy. (DPFOF ¶ 23, Reed Aff. ¶ 8.) Reed was not disciplined for not showing up for snow removal assistance when he first missed snow-removal duty. (DPFOF ¶ 24.)

In his affidavit, Reed states that he came in twice for snow removal in December of 2005, but no one was there early but him. (Reed Aff. ¶ 11.)

On November 29, 2005, Mr. Reed received a final warning for an altercation that he had with another salesperson, John St. Clair. (DPFOF ¶ 25.) Mr. St. Clair is white. (DPFOF ¶ 26.) The altercation began when Mr. Reed approached Mr. St. Clair while Mr. St. Clair was at a computer work

station.  (DPFOF ¶ 27.)  Mr. St. Clair instructed Mr. Reed to leave him alone.  (DPFOF ¶ 28.)  In response, Mr. Reed stated that he was going to remain standing near Mr. St. Clair.  (DPFOF ¶ 29.)  Mr. St. Clair responded by swearing at Mr. Reed.  (DPFOF ¶ 30.)  Mr. Reed responded by instructing Mr. St. Clair not to swear at him.  (DPFOF ¶ 31.)  Mr. Reed maintains that he did not threaten Mr. St. Clair during this incident.  (Reed Aff. at ¶ 7.)  According to one witness, Mr. Reed said "that will be the last time you say F U to me."  (DPFOF ¶ 32.)  Mr. Reed acknowledges that he said, "ain't going to be too many more of those f (and I used the initial) you's."  (DPFOF ¶ 33.)  During this incident, Mr. Reed was standing inches from Mr. St. Clair.  (DPFOF ¶ 34.)  Mr. St. Clair then walked away from Reed and stated to Reed that "you better watch your back."  (DPFOF ¶ 35.)  Mr. Reed responded with, "Do you want to jump?"  (DPFOF ¶ 36.)  In a Discrimination Complaint that he filed with the Equal Rights Division, Mr. Reed described his own behavior toward Mr. St. Clair on that day as "making this person aware that [Reed] was more than his match."  (DPFOF ¶ 37.)

After the incident, Vice President of Human Resources Tom Milczarski was contacted and investigated the matter.  (DPFOF ¶ 38.)  Mr. Milczarski conducted his investigation by interviewing the other co-workers who witnessed the altercation.  (DPFOF ¶ 39.)  Mr. Milczarski and Mr. Scudder met with Mr. St. Clair and Mr. Reed on November 29, 2005.  (DPFOF ¶ 40.)  Following the meetings, Mr. Scudder issued Mr. Reed and Mr. St. Clair identically-worded written warnings.  (DPFOF ¶ 40.)  During his meeting with Mr. Milczarski, Mr. Scudder and Mr. St. Clair, Mr. Reed did not deny that he had engaged in the conduct for which he was being disciplined.  (DPFOF ¶ 41.)  Rather, Mr. Reed attempted at the meeting to convince Mr. Milczarski and Mr. Scudder that his actions directed toward Mr. St. Clair were justified because of Mr. St. Clair's use of obscenities and Mr. Reed's belief that he had been "disrespected."  (DPFOF ¶ 42.)  Reed states in his affidavit that he was not allowed to say

anything before Milczarski and Scudder gave him a warning for his involvement in the incident with St. Clair.

Between the evening of January 20, 2006 and the morning of January 21, 2006, a significant amount of snow fell, necessitating all sales personnel who were scheduled to work on Monday to arrive early to clear the snow off of the vehicles on the lot. (DPFOF ¶ 43.) Mr. Reed failed to arrive for snow removal duty on or about January 21, 2006. (DPFOF ¶ 44.) Mr. Reed states in his affidavit that on January 21, 2005,[3] he fell and hit his head in front of his house. (Reed Aff. ¶ 14.) Initially, Mr. Reed called into work on January 21, 2006, as sick. (DPFOF ¶ 45.) Ultimately, Mr. Reed arrived at work around 1:00 p.m. for a half-day's work. (DPFOF ¶ 46.) Upon his arrival at work on January 21, 2006, Mr. Scudder instructed Mr. Reed to go home. (DPFOF ¶ 47; Reed Aff. ¶ 15.)

On or about February 6, 2006, Mr. Reed filed a Complaint of Discrimination against Ewald with the Equal Rights Division of the Wisconsin Department of Workforce Development ("ERD"), Case No. 200600388, and with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 26 G-2006-7600604. (DPFOF ¶ 48.) In support of his Complaint, Mr. Reed cited the incident during which Mr. Scudder became angry with him for refusing to advance money to put gas into a newly-purchased automobile. (DPFOF ¶ 49.) In support of his Complaint, Mr. Reed also cited his November 29, 2005 altercation with Mr. St. Clair, and further criticized the way the investigation was conducted, because he was not interviewed. (DPFOF ¶ 49.) Mr. Reed also included information in his Complaint about the January 21, 2006 snow removal incident and he complained that two potential sales were given to white salespeople. (DPFOF ¶ 49.)

On one occasion, Reed and two other individuals, J.C. Matthews and James Lipsey, decided to confront Ewald about its unfair distribution of sales calls to three white sales people. (Reed Aff.

---

[3]     The parties appear to reference the same event but Mr. Reed's affidavit states that the event occurred on January 21, 2005 while Ewald states that the event occurred on January 21, 2006.

¶ 13.) On another occasion, Reed was told to leave the business development center when he was talking to a black employee. (Reed Aff. ¶ 17.) Reed states in his affidavit that he knows of the following about employees at Ewald: (1) an employee failed to come to work for being "hung over," (Reed Aff. ¶ 27); (2) two other Ewald employees got into a shoving match on the job (Reed Aff. ¶ 30); (3) an employee was late for work over 30 times (Reed Aff. ¶ 28).

Upon receipt of the Complaint, Mr. Milczarski contacted Mr. Reed to discuss his ERD Complaint. (DPFOF ¶ 50.) Mr. Reed did not contact Mr. Milczarski in response to Mr. Milczarski's request to meet with Mr. Reed. (DPFOF ¶ 51.) On December 4, 2006, the ERD dismissed Mr. Reed's first ERD claim, Case No. 200600388, finding no probable cause of discrimination. (DPFOF ¶ 52.)

In his affidavit, Mr. Reed states that on or about February 9, 2006, Mr. Halama told Mr. Reed "you are a fucking moron . . . you don't know what the fuck you're doing . . . I don't know how you keep this fucking job . . . ." (Reed Aff. ¶ 20.)

In his affidavit, Mr. Reed states that he "[a]sked Roger Duame why Tom Milczarski was present during our March 1, 2006 meeting and he said because of my ERD complaint." (Reed Aff. ¶ 21.)

On March 6, 2006, Ewald's sales associates were obligated to report to work at 7:30 a.m. to sweep snow from the cars. (DPFOF ¶ 53.) Mr. Reed did not arrive for snow removal duty on March 6, 2006. (DPFOF ¶ 54.) Mr. Reed did arrive to work shortly after the snow removal had been completed. (DPFOF ¶ 55.)

One of the Ewald employees, Mr. Halama, asked Mr. Reed why Mr. Reed did not appear for snow removal duty. (DPFOF ¶ 56.) Mr. Reed responded by stating that he was dropping his daughter off at school. (DPFOF ¶ 57.) Mr. Halama stated that he believed Mr. Reed's response was a "bullshit excuse." (DPFOF ¶ 58.) The parties have slightly different versions of what happened after Mr. Reed

heard Mr. Halama's comment. Ewald states that, upon hearing Mr. Halama's comment, Mr. Reed placed his hat and briefcase on his desk, set down his lunch, and approached Mr. Halama. (DPFOF ¶ 59.) In his affidavit, Mr. Reed states that, after hearing Mr. Halama's comment, he "[p]laced his thermos, brief case and food cooler on the ground." (Reed Aff. ¶ 24.) One witness who observed Mr. Reed approach Mr. Halama described Mr. Reed's approach as "very physical and aggressive." (DPFOF ¶ 60.) Another witness stated that Mr. Reed "charged" Mr. Halama and "went chest to chest with him." (DPFOF ¶ 61.) Another witness stated that "Reed extended his chest, opened his eyes very wide and stopped within 4 [inches] of Jeff's chest." (DPFOF ¶ 62.) Yet another witness described their exchange as an "explosive shouting match" where the two men were "chest to chest shouting at each other." (DPFOF ¶ 63.) One witness heard Mr. Reed state to Mr. Halama "I'll deck you." (DPFOF ¶ 64.) Ultimately, one of the Ewald employees pulled Mr. Reed away from Mr. Halama. (DPFOF ¶ 65.)

Then General Manager Roger Duame overheard a portion of the confrontation between Mr. Halama and Mr. Reed. (DPFOF ¶ 66.) While he could not hear all of the conversation, Mr. Duame heard Mr. Reed tell Mr. Halama that if the latter kept "disrespecting" him that he would "deck" him. (DPFOF ¶ 67.) Mr. Duame summoned Mr. Reed into his office. (DPFOF ¶ 68.) After talking about the incident, Mr. Reed said that if Mr. Halama disrespected him again, then he would take Mr. Duame's coffee cup and hit Mr. Halama with it. (DPFOF ¶ 69.)

Mr. Milczarski, in his role as Vice President of Human Resources at Ewald, was informed of the incident between Mr. Reed and Mr. Halama and he investigated the claim. (DPFOF ¶ 70.) Mr. Reed was asked to provide his version of the events, orally. (DPFOF ¶ 71.) With Mr. Duame and Mr. Halama as witnesses, Mr. Reed proceeded to state that he had objected to Mr. Halama treating him in a manner that Mr. Reed believed to be rude. (DPFOF ¶ 72.) Mr. Reed acknowledged that he had

told Mr. Duame that if Mr. Halama treated him in a way that Mr. Reed found disrespectful that he would deck Mr. Halama. (DPFOF ¶ 73.) Mr. Reed stated that his comment about the coffee cup was a joke. (DPFOF ¶ 74.)

Based on his investigation, Mr. Milcrazski found that Mr. Reed had made a threat of violence, in violation of Ewald's Misconduct Policy. (DPFOf ¶ 75.) Based on Mr. Reed's violation of the company's misconduct policy, i.e., the incident involving Mr. Halama, and in light of the prior final warning issued to Mr. Reed following Mr. Reed's incident with Mr. St. Clair, Mr. Milcrazski recommended that Mr. Reed's employment be terminated. (DPFOF ¶ 76.) Mr. Milcrazski contacted Craig Ewald, who concurred with the decision to terminate Mr. Reed's employment. (DPFOF ¶ 77.) Mr. Reed's employment with Ewald was terminated that same day, to wit, March 6, 2006. (DPFOF ¶ 78.)

On or about December 27, 2006, approximately three weeks after his first Equal Rights Division Complaint was dismissed by the Equal Rights Division, Mr. Reed filed a second Complaint against Ewald with the Equal Rights Division, Case No. 200604417 and EEOC, Charge No. 26G-2007-00498C. (DPFOF ¶ 79.) In his second Complaint filed with the ERD, Reed claimed that the termination of his employment was based on his race and in retaliation for his previously-filed ERD complaint. (DPFOF ¶ 80.) In his second Complaint, Mr. Reed alleged that two managers became uncooperative with him. (DPFOF ¶ 80.) More specifically, Mr. Reed alleged that one of his mangers would not talk with Mr. Reed unless a witness was present. Mr. Reed further alleged that another manager allegedly asked Mr. Reed, "What are you going to do, sue me?" after Mr. Reed and the manager allegedly engaged in what Mr. Reed called a "heated argument." (DPFOF ¶ 80.) Mr. Reed also alleged that he was about to receive two written warnings, which Mr. Reed acknowledges were ultimately not issued to him. (DPFOF ¶ 80.)

On May 1, 2007, the ERD dismissed Mr. Reed's second Complaint, case no. 200604417, also finding no probable cause. (DPFOF ¶ 81.) On May 9, 2007, the EEOC dismissed both of Mr. Reed's complaints against Ewald. (DPFOF ¶ 82.) Mr. Reed admitted at his deposition that Mr. Scudder's anger at Mr. Reed was not due to Mr. Reed's race. (DPFOF ¶ 83. )

In his discovery responses, Mr. Reed alleges that he provided a test drive to a potential customer and then entered the customer's name, Diny L. Liggins, into a computer system. (DPFOF ¶ 84, Reed Aff. ¶ 4.) Mr. Reed alleges that the manager gave the customer and ultimately the sale to an unidentified white salesperson when Ms. Liggins returned and Mr. Reed wasn't there. (DPFOF ¶ 85.) He also alleged in his discovery responses that a customer named Dr. Al-Wathiqui was entered into the computer system as Mr. Reed's customer. Mr. Reed further alleges that Dr. Al-Qathiqui was assigned to a white salesperson named Mike when he returned to the dealership, even though Mr. Reed was there that day. (DPFOF ¶ 87.) Mr. Reed admits that he has no evidence to support his claim that Dr. Al-Wathiqui purchased an automobile. (DPFOF ¶ 88.) Mr. Reed states that Ms. Scudder told Dr. Al-Walthiqui, "when it comes to car sales, I am God." (Reed Aff. ¶ 10.)

It is the custom and practice of Ewald for a sales associate with whom a customer has had recent contact work with that customer again when that customer returns to negotiate the purchase of a car. (DPFOF ¶ 89.) But, if a customer returns to the dealership and the sales person with whom the customer spoke previously is not there, Ewald's practice is to have another sales person engage the customer in a sale. (DPFOF ¶ 90.) The sales person who closes the deal is credited with at least half of the sale. (DPFOF ¶ 91.) Depending on the circumstances, the sales person who previously engaged the customer may be credited with at least half of the sale. (DPFOF ¶ 92.) If necessary, adjustments can be made to the portion of each sale credited to a particular sales person. (DPFOF ¶ 95.) An adjustment often occurs when a sales person brings the sale to the manager's attention. (DPFOF ¶ 95.)

It is not an uncommon occurrence for a sale to be completed without the second salesperson being made aware that the customer has had their information previously entered into the system or otherwise becoming aware of the customer's prior contact with another sales person. (DPFOF ¶ 94.)

Mr. Reed contends that, while employed at Ewald, a sales call was given to a white employee over a black employee whom Reed contends made a move toward answering the call. (DPFOF ¶ 96.) At his deposition, Mr. Reed stated that a sales person told him that "Blacks don't last long here." (DPFOF ¶ 99.) Mr. Reed identified this sales person as "Don." (DPFOF ¶ 99.)

## II. STANDARD

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 630 (7th Cir. 2009). To state it differently, a party will be successful in opposing summary judgment only when they "present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) (citing *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)). The evidence must create more than "some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

Reed's complaint asserts that Ewald discriminated against him and subjected him to a hostile work environment due to his race and that Ewald retaliated against him for filing of a charge of discrimination with the ERD. In support of its motion for summary judgment, Ewald argues that Mr. Reed's claims should be dismissed because Reed "cannot state a prima facie case of discrimination or retaliation." (Def.'s Br. Supp. Summary Judgment Mot. ("Def.'s Br.") at 2.) In particular, Ewald argues that Reed has not demonstrated that he was treated differently than a similarly-situated employee. Ewald next argues that the majority of Reed's claims should be dismissed because he neither suffered a materially adverse action nor was he subjected to a racially hostile work environment. Ewald concludes by arguing that legitimate, nondiscriminatory reasons existed to support Ewald's decisions in connection with Reed's employment, including his termination.

To establish a prima facie claim of discrimination under Title VII, a plaintiff may proceed under the direct or indirect methods of proof. *See Cianci v. Pettibone Corp.*, 152 F.3d 723, 727-28 (7th Cir. 1998).

The direct method of proving a claim under Title VII requires a plaintiff to show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible factor such as race. *See Ciani*, 152 F.3d at 727. "Direct evidence usually requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

Mr. Reed has not presented a cogent argument, based upon the record, that supports any claim under the direct method that Ewald discriminated against Reed based upon his race. As a result, Reed has failed to establish a prima facie claim of discrimination under the direct method of proof.

In order to establish a prima facie case of discrimination under indirect method, the plaintiff must show that: (1) he is a member of a protected class; (2) he conducted himself in a manner consistent with his employer's legitimate business expectations; (3) he suffered from an adverse employment action; and, (4) similarly situated employees who are outside the protected class were treated more favorably. *Barricks v. Eli Lilly and Company*, 481 F.3d 556 (7th Cir. 2007); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir. 1996); *EEOC v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145, 148-49 (7th Cir. 1996). If a plaintiff cannot establish any one of these elements, summary judgment for a defendant is proper. *See Reed v. Amax Coal Company*, 971 F.2d 1295, 1299 (7th Cir. 1992).

If the plaintiff carries his initial burden of establishing a prima facie case, the employer then has the burden of "articulating" a legitimate, non-discriminatory reason for the adverse action about which the plaintiff complains. Once the employer articulates a legitimate non-discriminatory reason for the actions being challenged, the burden shifts back to the plaintiff to prove that the proffered reason was not the real reason for the action (i.e., it was pretextual). *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 1824-25, 36 L. Ed.2d 668 (1973); *Wallace*, 103 F.3d at 1397.

The plaintiff's burden of proof does not end with the requirement that he demonstrate that the employer's proffered reason should not be believed. Rather, at all times the plaintiff has the burden of persuading the fact finder that the employer intentionally discriminated against the plaintiff on the basis of the plaintiff's protected status. *St. Mary's*, 113 S. Ct. at 2747-48.

### a. Adverse Employment Action

Reed identifies a number of incidents that occurred at Ewald during his employment and argues that such incidents were adverse employment actions that were "economic in nature and psychologically devastating for Plaintiff." (Reed.'s Br. at 17.)

In support of its motion for summary judgment, Ewald argues that Reed's claim of discrimination, insofar as it applies to any materially adverse employment actions by Ewald short of Reed's termination, are either too insignificant to support a claim of discrimination against Ewald or were not adverse to Reed.

The Seventh Circuit has stated that a materially adverse employment action is one that significantly alters the terms and conditions of an employee's job. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). In other words, "the employee must complain of some action on the employer's part that causes her to suffer a real harm." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 902 (7th Cir. 2003). The United States Supreme Court has stated that this standard looks to determine whether "a reasonable employee would have found the challenged action materially adverse . . . ." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)

Reed appears to allege in his affidavit that Ewald took numerous adverse employment actions against him. Indeed, Ewald's brief identifies a list of sixteen possible adverse actions that Reed appears to assert Ewald took against him because of his race. The list identified by Ewald includes, among other things, Reed's assertions that (1) Reed was told to leave an area of the dealership where he was socializing with a black sales person; (2) Reed's requests for work-related supplies went unanswered; (3) Reed was subjected to foul language during conversations with other employees or managers; (4) a manager at Ewald told Reed to go home after Reed showed up late to work; and (5) two written warnings were given to Reed but later rescinded. To reiterate, Reed bears the burden of

showing that any of these actions or the others identified in Reed's submissions significantly altered the terms and conditions of Reed's employment at Ewald. *See Griffin*, 356 F.3d at 829. The court will address each of Reed's allegations.

Reed's claim that Ewald drafted but did not issue two written warnings to Reed about behavior does not amount to a showing that Ewald took adverse action against Reed. As Ewald notes, "unfulfilled threats that result in no material harm cannot be considered an adverse employment action." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (citing *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003)).

The same can be said for Reed's statements in his affidavit that managers at Ewald pointed a handful of sales away from black sales persons to white salespersons. In his affidavit, Reed states that "I entered D. Liggins as my customer into the company computer system known as contact management so she was officially listed as being my customer." (Reed Aff. at ¶ 4.) Reed also claims that a customer, Dr. Al-Wathiqui, was given to a white Ewald salesperson after initially working with Reed. But, and as Ewald notes, Reed's allegation in his affidavit is a far cry from establishing that Ewald sold a vehicle to Liggins or Dr. Al-Wathiqui. And Ewald has established that "[i]t is not an uncommon occurrence for a sale to be completed without the second salesperson being made aware that the customer has had their information previously entered into the system or otherwise becoming aware of the customer's prior contact with another sales person." (DPFOF ¶ 94.) In other words, Ewald may not have even known that Liggins or Dr. Al-Wathiqui had worked with Reed.

Moreover, Reed's allegation in his affidavit about his decision with two co-workers to confront Ewald over unfair sales distribution is not evidence that Ewald took an adverse employment action against Reed that significantly altered the terms of his employment.

The instances Reed points to wherein he claims management at Ewald used foul language in conversing with Reed, yelled at Reed, or told Reed to stay home on a day when he called in sick, do not present a showing that Ewald took adverse action against Reed that significantly altered the terms and conditions of Reed's employment. The United States Supreme Court has stated that "normally petty slights, minor annoyances, and a simple lack of good manners," will not establish a prima facie case of discrimination under Title VII. *Burlington*, 548 U.S. at 68. Given the Court's holding in *Burlington*, the Seventh Circuit found it "relatively easy" to dismiss a claim of retaliation under Title VII when a plaintiff complained of "being stared and yelled at." *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009). Thus, the issue is whether Reed can establish that Ewald took adverse employment actions against Reed that were "sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working environment." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 885 (7th Cir. 1998). The four or five incidents wherein Reed claims that managers at Ewald yelled or used foul language when talking to Reed simply do not amount to a sufficient showing that Ewald took adverse employment actions against Reed that significantly altered the terms of his employment. To be sure, Reed may have found management's actions to be unfair or unwarranted in certain circumstances, but Reed has not presented a persuasive argument that four or five instances spread out over a period of more than one year significantly altered the terms of Reed's employment.

Similarly, isolated comments from other Ewald employees such as "[b]lacks don't last too long around here" (DPFOF ¶ 103), or another individual's comment that young black men moving into the suburbs caused an increase in crime do not establish anything close to an adverse employment action against Reed. "[T]he mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" or "a lack of racial sensitivity," alone does not amount to actionable harassment.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87. Rather, the complained of conduct "must be extreme to amount to a change in the terms and conditions of employment . . . ." *Id.* at 788. Viewing the record in this case in light of the Court's statements, I am satisfied that Reed was not subjected to an abusive working environment based on the alleged isolated racial comments of certain individuals at Ewald.

Finally, the other incidents Reed complains of in his affidavit were not sufficiently severe or pervasive so as to alter the conditions of Reed's employment in a significant manner

In summary, the court has reviewed Reed's affidavit as well as the facts submitted by the defendant. Based on this review, the court is satisfied that Reed has not established that Ewald took materially adverse employment actions against Reed (not including the termination of Reed's employment) because of Reed's race.

## b. Reed's Termination

Reed identifies his termination as an adverse employment action taken by Ewald against him. In support of his claim, Reed argues that Ewald treated him less favorably than two other Ewald employees—St. Clair and Halama—who were both involved in disputes with Reed. Reed also argues that Ewald did not take disciplinary action against two other non-minority employees who were involved in disputes at Ewald. Ewald seeks to dismiss Reed's claim that the termination of Reed's employment with Ewald was based on Reed's race. Ewald argues that Reed's claim must be dismissed because he cannot establish that similarly situated employees were treated more favorably than Reed.

In order for Reed to succeed in establishing a prima facie case of discrimination, he must establish that other similarly situated individuals were treated more favorably. *See Herron v.*

*DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004). "[I]n disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). In this case, Reed must show that he and a similarly situated employee "were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003).

In support of its motion for summary judgment, Ewald argues that "[f]or Reed to convince a jury that the termination of his employment was based on his race, he would have to identify Caucasian sales employees who had engaged in conduct similar to the conduct on which his dismissal was based but who were not dismissed." (Ewald's Reply Br. at 4.) Ewald argues that "Reed cannot establish a prima facie claim of discrimination, as he cannot show that other similarly situated individuals were treated more favorably." (Ewald's Reply Br. at 4.) More specifically, Ewald argues that Reed "offers no evidence of another situation where an employee was found by Ewald to have made two threats of violence and whose employment was not terminated." (*Id.*) Ewald states that the reason for Reed's termination was the two incidents that Reed had with other Ewald employees. In support of this argument, Ewald states that St. Clair, a non-minority employee, received the same discipline—a written warning— from Ewald as Reed received. Ewald argues that Reed's second dispute with Halama resulted in Reed's termination because it was Reed's second incident involving another Ewald employee. Ewald concludes by asserting that "Reed has failed to identify a

non-minority employee of Ewald who engaged twice in workplace violence but who was able to retain his or her position. In fact, there is no such other individual." (Ewald's Br. at 24.)

Simply put, the court agrees with Ewald that Reed has not put forward any evidence showing with respect to Reed's termination that Reed was treated less favorably than a similarly-situated non-minority employee. Turning to Reed's dispute with St. Clair, the management at Ewald issued both men identically worded written warnings after investigating the incident. Thus, Reed has not shown that he was treated less favorably than St. Clair based on what occurred. And Ewald has established that Reed's dispute with Halama resulted in Reed's termination and not Halama's because Reed had already received a final written warning. Put another way, it was precisely because Halama and Reed were not similarly situated that Reed's employment was terminated and Halama's employment was not terminated.

With respect to Reed's claim that two other Ewald employees had an altercation but were not disciplined by Ewald, Reed has not presented any evidence that Ewald was aware of the altercation. Without establishing that Ewald knew that two of its employees had an altercation, Reed cannot show that Ewald treated similarly-situated employees differently for the same conduct. Given the foregoing, Reed has not established a prima facie case of discrimination and his claim falls short.

### c. Retaliation

Reed also claims that his termination was in retaliation for his having filed on February 6, 2006, a discrimination claim against Ewald. Reed asserts that Ewald's managers "treated Plaintiff harshly after Plaintiff filed a race discrimination charge with the ERD." (Reed's Br. at 21.) More specifically, Reed contends that "Mr. Halama told Plaintiff on February 8, 2006, that he would only speak to Plaintiff if a witness was present." (*Id.*) And Reed states that another Ewald employee asked

Reed whether Reed would sue him if he didn't stop cursing at Reed. (*Id.*) Additionally, Reed suggests that his termination, which was on March 6, 2006, was in retaliation for his having filed a charge of discrimination. Once again, the burden of proof as to this claim is on the plaintiff.

Under Title VII, it is unlawful for an employer to discharge or otherwise to discriminate against an employee because that employee has brought a charge under Title VII. *Pasqua v. Metropolitan Life Insurance Company*, 101 F.3d 514, 517 (7th Cir. 1996); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992). Like any other Title VII claim, a plaintiff can prove his or her claim by either direct or indirect evidence

Because Reed has not presented any direct evidence that Ewald discriminated against him because of the filing of Reed's ERD complaint, he has not established a prima facie case of discrimination under the direct method. Reed's sole avenue for relief is therefore under the indirect method.

There are three showings that a plaintiff must make in order to establish, through circumstantial evidence, a Title VII prima facie case of retaliation: "(1) that he opposed an unlawful employment practice; (2) that he was the object of adverse employment action; and (3) that the adverse employment action was caused by his opposition to the unlawful employment practice." *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000); *Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 938-39 (7th Cir. 1996). *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). The Court has stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006).

To the extent that Mr. Reed filed previous ERD charges, such action was protected activity. *McClendon*, 108 F.3d at 795. As to the second element, there is no question but that the plaintiff has suffered at least one adverse employment action, to wit, the termination of his employment. Thus, it is with respect to the other adverse actions that Reed claims Ewald took against him and with respect to the third element that the submissions on file with the court must be examined in order to ascertain whether summary judgment in favor of Ewald is appropriate.

Generally, a plaintiff may establish a causal link between statutorily protected expression and the adverse action by the employer through evidence that the discharge took place on the heels of protected activity. *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994); *McClendon*, 108 F.3d at 796. "A close temporal connection between the two events 'is generally enough to satisfy the third element of the prima facie test.'" *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). However, 'as the temporal distance between [the claimant's] protected expression and the adverse action increase[s], it is less likely that there is a causal link between the two events.'" *McClendon*, 108 F.3d at 797, (citing *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 485 (7th Cir. 1996)); *Johnson v. University of Wisconsin - Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995) ("[T]he substantial time lapse between the two events is counter-evidence of any causal connection.")

It is well-settled that once an employer responds to a plaintiff's prima facie case by articulating a legitimate, nondiscriminatory reason for the discharge, the burden then shifts back to the employee to show that the employer's proffered reasons are pretextual and that its actual reason is discriminatory or retaliatory. *McClendon*, 108 F.3d at 797. *See also Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994); *Dey*, 28 F.3d at 1457.

22

Ewald states that "[a]s to the termination itself, Ewald has explained . . . that Reed's termination was for the legitimate, non-discriminatory reason that he had threatened violence against a co-worker after he had been issued a final warning for threatening another co-worker less than three months prior." (Ewald's Br. at 34.)

The closest Reed comes to presenting an argument that his termination at Ewald was as a result of his filing a complaint with the ERD is the temporal proximity between the filing of his complaint and his termination. In this case, the time between Reed's filing of a charge of discrimination with the ERD and his discharge was approximately one month. And, to be sure, this temporal proximity supports a slight inference that the termination of Reed's employment was in retaliation for Reed having filed a charge of discrimination. But courts have repeatedly held that mere temporal proximity is not enough to make a prima facie case of discrimination. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). This is especially so in this instance where Reed, after receiving a final warning not to engage in disputes with coworkers, got into a dispute with a coworker on the day of his termination. As a result, the court agrees with Ewald that Reed has not made a prima facie case that his termination was in retaliation for his filing a complaint with the ERD.

As the Supreme Court has stated, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414-15 (2006). And as discussed in the context of Reed's race discrimination claim, "normally petty slights, minor annoyances, and a simple

lack of good manners," will not establish a prima facie case of discrimination under Title VII. *Burlington*, 548 U.S. at 68.

After reviewing the record in this case, the court is satisfied that Ewald has established that any actions taken by Ewald against Reed consisted, at most, of petty slights, minor annoyances and a simple lack of good manners. To be sure, Reed has set forth facts supporting his claim that Ewald employees may not always have shown Reed the respect to which he claims he was entitled. More specifically, Reed has averred in his affidavit that in the time following the filing of his complaint with the ERD: (1) one of the managers at Ewald refused to meet with Reed unless a witness was present; (2) one of the employees at Ewald asked Reed whether Reed would sue him; (3) Mr. Halama yelled an obscenity at Reed; (4) a manager at Ewald told Reed that another manager was present at a meeting because of Reed's ERD complaint; (5) one of the managers at Ewald told Reed to leave the business development center while Reed was talking to a black employee; (6) one of the managers at Ewald told Reed to stop talking to a receptionist even though other salespersons were allowed to talk to her; and (7) one of the employees at Ewald, Roger Duame, gave Reed two warnings but then rescinded them. (Reed Aff. at ¶¶ 16-23.)

But Reed has not offered any evidence that Ewald formally altered the terms of Reed's employment following the filing of Reed's ERD complaint. Moreover, while Reed may not have enjoyed being yelled at by one of his fellow employees or being asked whether he would sue another, these comments do not establish that Ewald took actions that adversely affected the terms of Reed's employment. Thus, although Reed may have found his co-workers' actions off-putting, the Seventh Circuit has stated that "Title VII 'does not set forth a general civility code for the American workplace . . . .'" *Erickson*, 569 F.3d at 790 (quoting *Burlington Northern*, 548 U.S. at 68). As for the presence

24

of managers or other witnesses when Ewald's management met with Reed, the two occurrences identified by Reed do not rise to any sort of adverse action that materially affected the terms or conditions of Reed's employment with Ewald.

Finally, the two written warnings that Duame gave to Reed and then rescinded did not constitute materially adverse employment actions. Most importantly, the two warnings did not result in any tangible job consequence to Reed. *See Oest v. Illinois Dept's of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("Nor do we believe that the oral or written reprimands received by Ms. Oest under the Department's progressive discipline system can be considered, on this record, as implicating sufficiently 'tangible job consequences' to constitute an independent basis of liability under Title VII.").

In sum, Ewald is entitled to summary judgment on Reed's claim that Ewald retaliated against him because he filed a complaint with the ERD and EEOC will be granted.

**d. Pretext**

In any event, because Ewald has established legitimate non-discriminatory reasons for its actions that are not pretextual, Ewald's motion for summary judgment on Reed's claims will be granted. Ewald argues that its reasons for terminating Reed's employment stem from Reed's two incidents involving his threats against fellow coworkers. Ewald states that "Reed does not dispute that he challenged St. Clair, asking him, 'Do you want to jump?' or that he stated that he would take a coffee cup and hit Halama on the side of the head with it if he believed that Halama disrespected him." (Ewald's Br. at 26.) Based on the foregoing, Ewald concludes by arguing that "Reed has not and cannot provide any evidence from which a reasonable jury could conclude that Ewald's decision to

terminate his employment was based on his race, or that Ewald's stated reasons for terminating him are lies . . . ." (*Id.* at 27.)

The bottom line in a pretext analysis is that "if an employer acted in good faith and with an honest belief, [courts] will not second-guess its decisions." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999). This is so because "no federal rule requires just cause for discharges." *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir. 1987). The Seventh Circuit stated in *Green* as follows:

> To successfully challenge the honesty of the company's reasons [the plaintiff] must specifically rebut those reasons. But an opportunity for rebuttal is not an invitation to criticize the employer's evaluation process or simply to question its conclusion about the quality of an employee's performance. Rather, rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination.

*Id.* (quoting *Kariotis v. Navistar Int'l Transportation Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)).

This court has no difficulty in concluding that Ewald had a good faith basis for believing that Reed had engaged in two incidents involving threats in the workplace.

With respect to Reed's dispute with St. Clair, Ewald's vice president of human resources, Tom Milczarski, investigated Reed's dispute with St. Clair. As part of his investigation, Milczarski interviewed employees who witnessed Reed's dispute with St. Clair. Following Milczarski's investigation, he interviewed Reed and St. Clair. In his interview with Milczarski, Reed attempted to justify, but did not deny, the actions he took in his dispute with St. Clair. More specifically, Reed did not deny that he asked St. Clair, "Do you want to jump?" Reed has not presented any evidence that Ewald was not justified in issuing both Reed and St. Clair a final warning not to engage in similar behavior in the future.

Turning to Reed's dispute with Halama, it is undisputed that Ewald's general manager heard Reed tell Halama that Reed would "deck" Halama. It is also undisputed that Reed told Ewald's general manager that if Halama disrespected Reed again, then Reed would take the general manager's cup and hit Halama with it. While Reed contends that he was kidding when he made this statement, the point is that Ewald had a good faith basis---even if mistaken in its belief---for determining that Reed was contemplating violence in the workplace.

Given the foregoing, Ewald has presented evidence that its stated reason for terminating Reed's employment, to wit, his two incidents with co-workers, was based on Ewald's good-faith belief that Reed had violated a company policy against violence in the workplace. Simply put, an employee engaging in a dispute with another employee after receiving a final warning not to do so constitutes cause for terminating that employee's employment. Additionally, after reviewing Reed's affidavit and exhibits on file, the court is satisfied that Reed has not presented evidence to show that Ewald's stated reason for terminating Reed's employment was something other than Reed's two incidents with coworkers. Absent any such evidence, Ewald's motion for summary judgment on Reed's claim that he was terminated because of his race or because of the filing of his ERD complaint will be granted.

**e. Harassment**

To the extent that Reed may be attempting to assert a claim of harassment in violation of Title VII, the court also finds that such claim fails as a matter of law.

In order for Reed to establish a prima facie case of hostile environment racial harassment, Reed must establish the following: (1) he was subjected to unwelcome harassment; (2) the harassment was based upon his race; (3) the harassment was so severe and pervasive so as to alter the conditions of his employment and create a hostile or abusive working environment; and (4) there is a basis for

Ewald to be held liable for the harassment. *See Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). Again, for the harassment to be actionable, it must be sufficiently severe or pervasive so as to alter the conditions of Reed's employment and create an abusive working atmosphere. *See id.*

Reed has failed to show that the incidents he complains of were so severe or pervasive "that a reasonable person would . . . consider the environment to be racially hostile." *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272 (7th Cir. 1991). The Seventh Circuit has stated, "[t]he workplace that is actionable is one that is hellish." *Logan v. Kautex Textron North America*, 259 F.3d 635, 641 (7th Cir. 2001) (internal quotations omitted). Simply put, the dozen or so incidents that Reed complains of, which were spread out over a period of more than one year, are not sufficient to raise an actionable claim that Reed's workplace was hellish or racially hostile. Indeed, many of the incidents that Reed complains of do not appear to be examples of racial harassment. For example, Reed has not presented any argument that a manager telling Reed to advance money for a customer's gas was an example of racial harassment. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (affirming a district court decision that no reasonable jury could find the comment that the plaintiff was a "dunce," among other comments, was racial in character or purpose). Similarly, Reed has not shown that his being told to go home after calling in sick and missing snow removal duty was reflective of racial harassment. As for the foul language Reed claims he was subjected to, the Seventh Circuit has found examples of worse language insufficient to constitute racial harassment. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340 (7th Cir. 1999) (finding comments from a supervisor such as "dumb motherfucker" and "get your head out of your ass," to be "juvenile" but not reflective of a

hostile work environment).  In other words, to the extent that Reed has presented a claim for harassment under Title VII, Ewald's motion for summary judgment on this claim will be granted.

**NOW THEREFORE IT IS HEREBY ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

**SO ORDERED** this 26th day of August 2010 at Milwaukee, Wisconsin.

**BY THE COURT:**

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
